# United Carbon Company et al. v. Campbellsville Gas Company.

(Decided July 2, 1929.)

O. B. BERTRAM and O. E. SWARTZ for appellants.

B. A. RICE, R. T. GARNETT, P. K. McELROY and NOGGLE & GRAHAM for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

The appellant, United Carbon Company, is the owner of a large number of natural gas wells scattered over Taylor and Green counties. Part of the gas it secures from these wells it sells to the Taylor-Green Gas Company, which supplies the gas under a franchise to the residents of the town of Campbellsville. These two companies have been thus engaged for several years last past. In the early history of the gas field of Taylor and Green counties, the gas pressure was quite strong, but, due to the activities of a carbon black plant, which has since been dismantled, the gas pressure has steadily declined until now, as seems to be conceded, it is less than five pounds rock pressure. Most of the gas wells of the appellant are remotely located from the town of Campbellsville, but it has two upon what is known as the Chandler lease, which lies just outside of the city limits of Campbellsville. Due to the low pressure in its wells, the appellant had for some time prior to the organization of the appellee been taking the gas which it secured from its more remotely located wells and storing it in the

wells on the Chandler lease, from which later it was drawn as needed to supply the town.

In the spring of 1928, the appellee was organized to supply natural gas to the town of Campbellsville. It purchased or leased small tracts of land near to the Chandler wells on which it drilled for and procured natural gas. It also drilled two other wells some little distance away from the Chandler wells, but close to a natural gas well on the graded school lot, the gas from which was used by the graded school for its purposes. Under a franchise which it procured from the town of Campbellsville, the appellee entered into active and effective competition with the appellant in the supply of natural gas to the residents of Campbellsville. In the winter of 1928-29 the appellant installed on its Chandler lease a compressor which can be so operated as not only to sustain or increase the pressure in the service mains but also by suction to increase materially the flow of natural gas from the wells to which it may be coupled. Appellant insists that it installed this compressor solely for the purpose of maintaining the proper pressure in the mains in the town of Campbellsville and to procure gas for the purpose of furnishing other communities in which it was seeking franchises, that it had determined to install this compressor long before the appellee was ever thought of, and that it was not installed with the intent of working any hardship on the appellee. The appellee insists that the working of this compressor has materially reduced the flow of gas from all the wells in this gas field, and especially from the gas wells which it owns. It also hints that the primary purpose of the appellant in installing this compressor was to destroy the appellee's competition by ruining its wells. For these reasons the appellee brought this suit to enjoin the appellant from using the compressor. On final hearing the court entered a judgment enjoining the appellant "from decreasing the natural flowage of gas in appellee's wells and lines of pipe by use of the compressor in evidence." From that judgment this appeal is prosecuted.

In the absence of any statute controlling the question, may an owner of a natural gas well increase the flow of natural gas from such well for a legitimate purpose by the use of a compressor? This question has never been presented for decision before in this state. In its discussion, however, there are four cases from this court to which reference must be made. The first of these cases

is that of Louisville Gas Co. v. Kentucky Heating Co., 117 Ky. 71, 77 S. W. 368, 25 Ky. Law Rep. 1221, 70 L. R. A. 558, 111 Am. St. Rep. 225, 4 Ann. Cas. 355. There the appellant was enjoined from wasting natural gas which it took from its wells in such large quantities as to materially reduce the pressure in the wells of the appellee. In that opinion we said:

"While natural gas it not subject to absolute ownership, the owner of the soil must, in dealing with it, use his own property with due regard to the rights of his neighbor. He cannot be allowed deliberately to waste the supply for the purpose of injuring his neighbor. . . . Every owner may bore for gas on his own ground, and may make a reasonable use of it; but he may not wantonly injure or destroy the reservoir common to him and his neighbor."

The next case is that of Commonwealth v. Trent, 117 Ky. 34, 77 S. W. 390, 25 Ky. Law Rep. 1180, 4 Ann Cas. 209, which was a companion case to the Louisville Gas Co. case, supra. There the court upheld a penal action against an individual who was wasting the natural gas taken from certain wells for the sole purpose of injuring gas wells belonging to competitors. The case went off on the same grounds as did the Louisville Gas Co. case, supra.

The next case is that of Calor Oil & Gas Co. v. Franzell, 128 Ky. 715, 109 S. W. 328, 33 Ky. Law Rep. 98, 36 L. R. A. (N. S.) 456. There the right of the Calor Oil & Gas Company, which was the subsidiary through which the Louisville Gas & Electric Company was competing in the gas field with the Kentucky Heating Company, to condemn a right of way for its pipes, was upheld. In the course of the opinion, we said in answer to the argument that the activities of the Calor Oil & Gas Company would serve to reduce the gas in the wells of the Kentucky Heating Company:

"But each has the legal right to the legitimate use of the gas underlying its own property, and neither can complain of such use by the other. We have already held . . . that one who illegitimately wastes or destroys the gas . . . may . . . be enjoined from committing such wrongful acts; but all parties owning gas wells in the districts are free to make any legitimate use of gas they choose, and

the fact that this legitimate use tends to exhaust the supply gives the other owners of gas wells in the district no just ground of complaint.''

The last case is that of Louisville Gas Co. v. Kentucky Heating Co., 132 Ky. 435, 111 S. W. 374, 33 Ky. Law Rep. 912. That was a suit brought by the Kentucky Heating Company for damages done to its wells by the wasting of the gas which was enjoined in the case reported in 117 Ky. 71, supra. The case was reversed for errors occurring during the trial, in which the Kentucky Heating Company secured a verdict for $60,000. In the course of the opinion we said:

"The right . . . to take from subjacent fields or reservoirs is a right in common. There is no property in the gas until it is taken. Before it is taken it is fugitive in its nature, and belongs in common to the owners of the surface. The right of the owners to take it is without stint; the only limitation being that it must be taken for a lawful purpose and in a reasonable manner. Each tenant in common is restricted to a reasonable use of this right, and each is entitled to the natural flow of the gas from the subjacent fields, and any unlawful exercise of this right, by any tenant in common, which results in injury to the natural right of any other tenant or surface owner, is an actionable wrong. The damage sustained is only that which results from an improper interference with the natural flow of the gas in the wells and pipes of another. . . .

"Appellants had the right, as had every other surface owner, to take from the field, in its natural flow, gas without stint; and, had the same quantity or more been taken in rightful use, and the same damage ensued, or even had the field been destroyed thereby, appellee would have no just cause of complaint.''

From these cases we gather that the owner of a gas well has no right to waste the product of that well, at least in such fashion as to injure the wells of his neighbor; that he has the right to use without stint for any legitimate purpose the natural flow from his well; but whether he has the right to stimulate that natural flow for a legitimate purpose is neither discussed nor decided. The last of these cases was decided in 1909 when the

issue of a stimulation of the flow had never been raised, and probably there were no compressors in use in the state.

Natural gas, like oil, is fugitive in its nature. It belongs to him who, having the surface right to do so, reduces it to possession, at least if such reduction to possession is for a legitimate purpose. This is so even though by so reducing it to possession his neighbor loses from such wells as he may have. This principle is strikingly illustrated in this case, for appellees, by buying or leasing the insignificant tracts of land immediately adjoining the Chandler lease and drilling for gas thereon, have depleted the wells of the appellant located on their Chandler lease, and also rendered them unfit for the storage purposes we have mentioned. However, as appellee rightly contends, this was its right as the owner or lessee of these tracts, no matter how small or insignificant they may be.

In Summers on Oil and Gas, sec. 24, it is said:

"In conclusion it may then be said that the courts by an unbroken line of dicta and actual decision have held that the land owner has legal privileges of taking oil and gas from his own land, even though in so doing he take a part or all of the oil and gas from the land of his neighbor, and that his neighbor has no rights that he so take the oil and gas from their lands. But the particular land owner also has no rights that his neighbors take the oil and gas by operations conducted upon their lands, and the neighbors of course have correlative legal privileges to so take his oil and gas. The courts have so held because of the peculiar physical facts of oil and gas, any other rule would not result in their speedy and efficient production which social welfare demands."

If, instead of drilling other wells upon its Chandler or other leases, the appellant chose to stimulate the flow from the wells it had on these leases, did such a choice of alternatives render its conduct illegal?

As to oil wells, it is the settled practice, fortified by judicial decision where the question has arisen, that the owner of such wells may pump them, even though by so doing the flow of oil in the wells of others is diminished. So much is conceded by Thornton in his Treatise on The Law of Oil and Gas (3d Ed.) sec. 32, though he will not

apply the doctrine to gas wells. Thus in Jones v. Forest Oil Co., 194 Pa. 379, 44 A. 1074, 48 L. R. A. 748, this principle was applied and upheld, the court saying:

"In this case the defendant has the exclusive right to bore for oil on the farm of the Boyce heirs adjoining a farm owned by plaintiff. The right being a lawful one, the defendant is at liberty to use all lawful means to obtain 'all the gas and oil contained in, or obtainable through the land.' Westmoreland Natural Gas Co. v. De Witt, 130 Pa. 249, 18 A. 724, 5 L. R. A. 732; and to that end it may resort to the use of all known lawful modern machinery and appliances."

In answer to the argument that the use of the pump reduced the flow in the wells of others, the court in this Jones case said:

"Plaintiff assumes that there is a certain fixed amount of oil and gas under his farm, in which he has an absolute property. True, they belong to him while they are part of his land; but when they migrate to the lands of his neighbor, or become under his control, they belong to the neighbor. . . . 'They (oil and gas) belong to the owner of the land, and are part of it, so long as they are on or in it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of the gas. If an adjoining or even a distant owner drills his own land and taps your gas, so that it comes into his well and under his control, it is no longer yours, but his.' . . . If possession of the land is not necessarily possession of the oil and gas, is there any reason why an oil and gas operator should not be permitted to adopt any and all appliances known to the trade to make the production of his wells as large as possible?"

After discussing the right to pump percolating waters, the court in the Jones case continued:

"If it is lawful to take water from a substrata by the 'exercise of all the skill and invention of which man is capable,' we see no reason why it is not lawful to produce oil by those means."

In Nourse v. Andrews, Mayor, 200 Ky. 467, 255 S. W. 84, we made the distinction between the rights of owners of the soil in subterranean streams and their rights to subterranean percolations. As to the latter, the dictum in this Nourse case brings them within the doctrine of the Jones case, supra.

In the case of Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206, 5 A. L. R. 411, the same rule as was followed in the Jones case, supra, was adopted as controlling the issue in that case. The court, in the course of its opinion said:

> "Defendant does not contest the right of plaintiff to get out of its land all the oil it possibly can, and by means of a well, but contests plaintiff's right to do this by means of a pump, because the pump sucks the oil from under defendant's land. The argument is that plaintiff may appropriate the oil passing from defendant's land to plaintiff's provided the oil passes, or flows, from the one tract to the other 'naturally,' that is, by gravity, and not as the effect of the use of artificial means. So far as artificiality is concerned, we do not see the difference between a well and a pump; both are artificial; both cause the oil to flow from the neighbor's land; and both produce that effect by creating a vacuum which the oil from the neighbor's land comes in to fill. . . . Plaintiff's right to operate this pump would appear, therefore, to be clear."

To the same effect is Kelly v. Ohio Oil Co., 57 Ohio St. 317, 49 N. E. 399, 39 L. R. A. 765, 63 Am. St. Rep. 721.

It being settled that the owner of an oil well may pump the same, although the flow of wells in adjoining land may be thereby diminished, we see no reason why the same result should not attach to the question of pumping from gas wells. Both oil and gas are alike in the properties which have induced the courts to sustain the right of the owner of an oil well to pump the oil therefrom. No distinction in reason suggests itself to us between the right of the owner of an oil well to pump it and the right of an owner of a gas well to pump it.

Where the question has arisen (even in Indiana where the courts have held that at common law as well as under the statute an owner of a gas well may not pump it at less than atmospheric pressure so as to injure the flow of gas in wells of other owners; see Manufacturers'

Gas & Oil Co. v. Indiana Natural Gas & Oil Co., 155 Ind. 461, 57 N. E. 912, 50 L. R. A. 768), it has been held that the owner of a gas well may stimulate its flow by the exploding of nitroglycerine in the wells. It was so held in the case of Texas Pacific Coal & Oil Co. v. Comanche Duke Oil Co. (Tex. Civ. App.) 274 S. W. 193. Although this opinion of the Court of Civil Appeals of Texas was reversed when the case reached the Supreme Court of Texas—see Comanche Duke Oil Co. v. Texas Pacific Coal & Oil Co. (Tex. Com. App.) 298 S. W. 534—the right to use nitroglycerine was upheld, but it was also held that by its use the user had no right to make a physical invasion on the property of his neighbor. In the opinion of the Court of Civil Appeals it is said:

"The owner of the surface of one tract of land, and of a producing well thereon, cannot complain if his neighbor sinks a well on the adjoining tract, even though the latter operation drains all the oil from beneath both tracts, and thereby completely destroys the purpose and value of the first well. This rule rests upon the doctrine stated, that the owner of the surface obtains no title to the oil beneath that surface until and unless he first reduces it to his possession; for, so long as it is in the fugitive state, it is subject to capture by any person seeking it in good faith from his own premises as a base, and when once captured the title becomes vested in the captor. Offset wells are thus authorized by the (general) rule stated, which is universal.

"The doctrine goes further. If the offset well does not efficiently tap the source from which the pioneer well gets its flow, then the operator of the former may resort to artificial means in order to force production, and by this means he may destroy the value of the initial well by absorbing the entire source. This may be done by the use of pumps sunk into the offset well, to operate which the owner may use all the force necessary to accomplish the purpose, even though it may divert the whole supply of the first well and thus completely destroy its value."

The Indiana case to which we referred is that of People's Gas Co. v. Tyner, 131 Ind. 277, 31 N. E. 59, 16 L. R. A. 443, 31 Am. St. Rep. 433.

If the flow of natural gas may be stimulated by the use of nitroglycerine, we see no good reason why it may not be stimulated by the use of a pump.

We are not unmindful of the Indiana cases to which we have referred, but they seem to go off on the idea that gas is more like unto subterranean streams than to oil or subterranean percolating waters. But we believe the better analogy is to oil. This corresponds to geological information, and it corresponds to the experience of those who labor in the oil and gas fields. As said in Wettengel v. Gormley, 160 Pa. St. 559, 28 A. 934, 40 Am. St. Rep. 733:

> "It is well understood among oil operators that the fluid is found deposited in a porous sand rock . . . below the surface. This rock is saturated . . . and when the hard stratum overlying it is pierced by the drill the oil and gas find vent and are forced, by the pressure to which they are subject, into and through the well to the surface. . . . An oil or gas well may . . . draw its product from an indefinite distance, and in time exhaust a large space . . . The vagrant character of the mineral, and the porous sand-rock in which it is found, . . . fully justify the general conclusion we have stated above, and have led to its general adoption by practical operators."

See, also, Niles v. Meade, 189 Ky. 243, 224 S. W. 854.

We are convinced that the rule as to gas wells should be the same as to oil wells, and hence are unable to follow the Indiana court in its conclusion as to the right of an owner of a gas well to pump it at common law.

The NewYork case of Hathorn v. Natural Carbonic Gas Co., 194 N. Y. 326, 87 N. E. 504, 23 L. R. A. (N. S.) 436, 128 Am. St. Rep. 555, 16 Ann. Cas. 989, which involved the right of an owner of a water well in the Saratoga Springs district to pump the water in large quantities, not for the purpose of using or selling the water as such, but for the purpose of extracting the gas from it and throwing the water away, rests either on the doctrine of waters which the New York court adopted or principles of waste—the idea being that the natural product was wasted as such—or both.

Oil and gas being under our decisions analogous as to what rights the owners of the wells through which they are reduced to possession have, and the owner of an oil well having a right to pump it, at least for a legit-

284

imate purpose, we are of the opinion that the owner of a gas well has the like right.

The record fails to show any sinister purpose on the part of the appellant in the use of the compressor here in question. It was installed because of the sinking pressure in this gas field which made the service in the town of Campbellsville very unsatisfactory. It is not disputed that the town of Greensburg, served from wells in this field also, would be without gas but for the use of a compressor. The appellant is also seeking, as it had a right to do, other cities to supply with natural gas. All these purposes are legitimate. If the appellee's wells are hurt by the use of the compressor, the difference between the hurt to their wells and the hurt done the Chandler wells when appellee sunk its wells is one of degree rather than of substance.

It is well known, and this record so discloses, that the gas fields of Eastern Kentucky would be of but little use if the owners of the wells could not use compressors. They have been used in that territory for a long time, and the dearth of legal contest over their use is somewhat persuasive of the prevalent idea of the lawfulness and the reasonableness of their use.

We are therefore of the opinion that the lower court erred in granting the injunction it did. Its judgment is therefore reversed, with instructions to dismiss the appellee's petition.

Whole court sitting.